1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF LOUISIANA

3                LAKE CHARLES DIVISION

4


5   ALEXANDER L. ACKEL, JR.,      *    Docket No. 07-1052
    ET AL,                        *
6                 Plaintiffs,     *
                                  *
7   VS                           *    April 16, 2009
                                  *
8   CITGO PETROLEUM CORPORATION,  *
                 Defendant.       *    Lafayette, Louisiana
9   *******************************************************


10

11       REPORTER'S OFFICIAL TRANSCRIPT OF THE MOTION HEARING
            BEFORE THE HONORABLE RICHARD T. HAIK,
12              UNITED STATES DISTRICT JUDGE.


13  **APPEARANCES**:

14  For the Plaintiffs:           Matthew E. Lundy
                                  Glen D. Vamvoras
15                                J. Rock Palermo, III

16
    For the Defendant:            Meredith Cunningham
17                                Adam Swensek

18

19

20

21

22

23

24  **REPORTED BY**:   Mary V. Thompson, RMR, FCRR
                       800 Lafayette Street, Ste. 3105
                       Lafayette, Louisiana 70501
25                     (337)593-5222

```
 1                    P R O C E E D I N G S
 2            THE COURT:  *Ackel versus CITGO*.
 3            Let's get appearances for the record starting with
 4    plaintiffs' counsel.
 5            MR. LUNDY:  Matt Lundy for Ackel plaintiffs.
 6            MR. PALERMO:  Rock Palermo.
 7            MR. VAMVORAS:  Glen Vamvoras.
 8            MS. CUNNINGHAM:  Meredith Cunningham on behalf of
 9    CITGO Petroleum Corporation.
10            MR. SWENSEK:  Adam Swensek on behalf of CITGO.
11            THE COURT:  All right.  You're on first.
12            MS. CUNNINGHAM:  Thank you, Your Honor.
13            Judge, we're here on a motion to strike Paul
14    Rosenfeld as an expert witness in this case.  The kind of
15    timeline that we're talking about and that's relevant to this
16    motion is plaintiffs disclosed to us a Rosenfeld report on
17    January 23, 2009.  Under the Court's scheduling order when
18    the case --
19            THE COURT:  Well, that scheduling order was set
20    aside.
21            MS. CUNNINGHAM:  Right.  Right, Judge, it was set
22    aside.
23            THE COURT:  The case was set aside.
24            MS. CUNNINGHAM:  Understood.  The case was set
25    aside, Judge.  The relevancy and the importance about the
```

1   prior scheduling order, though, Judge, is that the parties,

2   the plaintiffs in particular, were supposed to serve

3   expert --

4           THE COURT:  Didn't I ask y'all to send me a revised

5   scheduling order?

6           MS. CUNNINGHAM:  That was --

7           THE COURT:  That was part of the agreement.

8           MS. CUNNINGHAM:  That was a part of the plan,

9   Judge, and I'm not sure why that never happened.  I mean, I

10  think we --

11          THE COURT:  Well, defendants agreed to that.

12          MS. CUNNINGHAM:  We did.  I think all the parties

13  did.

14          THE COURT:  And nobody submitted one.

15          MS. CUNNINGHAM:  Right.

16          Let me back up for just a minute.  As far as the

17  prior scheduling order and the importance of it, it's

18  not that the deadlines -- even if you want to say the

19  scheduling order was never submitted and something should

20  have been submitted after the trial was continued, it's still

21  relevant and important, Judge, that the June 2008 date passed

22  without the plaintiffs serving an expert report on us,

23  particularly a Paul Rosenfeld expert report.  Because at that

24  time, Judge, the way this case was postured was that this was

25  a property damage case only.  The plaintiffs were under the

1   obligation as of June, 2008 to submit expert reports.  They

2   submitted expert reports for Randy Horsak and expert reports

3   for Mr. Simons.  That was it.  And that's all they submitted

4   at that point in time.

5           There was no indication to us, or to the Court,

6   that they were going to retain Paul Rosenfeld in this case;

7   much less that they were submitting a report for him under

8   Rule 26.  At that point in time the parties, at least CITGO,

9   were under the impression that this was a property damage

10  only case.

11          Now, I agree with the Court that this was

12  continued.  But at the same time, when the continuance was

13  granted it didn't give the plaintiffs latitude to remake this

14  claim into a personal injury case on top of --

15          THE COURT:  Yeah, but I did give everybody latitude

16  to submit another scheduling order.

17          MS. CUNNINGHAM:  Yes, a scheduling order.

18          THE COURT:  That was -- I guess it was more of a

19  request than an order.

20          MS. CUNNINGHAM:  I understand that.  And my

21  apologies on behalf of CITGO that one wasn't issued.

22          But, again, as far as the intent behind continuing

23  the trial, I don't think any of the parties or the Court

24  intended to remake this case or to permit the plaintiffs

25  latitude to introduce personal injury claims when that was

1    never in the case to begin with.  As of June 28, 2008 when

2    the plaintiffs had no reason to believe the trial was going

3    to be continued, they only submitted reports for experts that

4    dealt with property damage.  They submitted nothing as far as

5    personal injury reports at that time.

6            And while if the Court --

7            THE COURT:  Do you have medical reports?

8            MS. CUNNINGHAM:  No, Judge.

9            THE COURT:  Okay.

10           MS. CUNNINGHAM:  So that was the state of affairs

11   as of June, 2008.  The continuance obviously was granted,

12   but, again, there was no plan to remake this case.

13           We've submitted, in connection with our memo,

14   discovery responses that ask for the nature of the claims.

15   Again, the plaintiffs didn't say personal injury.  They

16   didn't list that or provide medical records.

17           You know, just as of June, '08, we're under the

18   impression this is a property damage case.  And I think the

19   Court was to some extent, too.  I think there's been some

20   discussion about whether or not personal injury even belongs

21   here.

22           The point of the matter isn't it is untimely

23   because it wasn't submitted in June of '08.  The importance

24   of it is that this wasn't a personal injury case as of June

25   of '08, and I don't know how it could have turned into one

1   all of a sudden on January 23rd, 2009.  That was the first

2   time the plaintiffs took an affirmative step to provide any

3   evidence to the Court that personal injury claims were a part

4   of this case.  And they can state it in the pleadings and

5   give some sort of indication in a Rule 26(f) disclosure.

6         But, again, Judge, the rules require that you

7   submit expert reports.  You have to provide some evidence of

8   medical-related or personal injury claims.  That wasn't

9   done -- at least it wasn't done until January of 2009.

10  Which, you know, doing that and having presented that in

11  January of '09 is nothing more than an attempt to remake

12  these claims.  And that's why our position is, look, these

13  are property damage claims.  They always have been.  They

14  were for two and a half years as this case has progressed,

15  and all of a sudden we have this personal injury expert

16  injected into the case.

17        THE COURT:  All right.

18        MS. CUNNINGHAM:  And I can go through additional

19  argument, Judge, about the *Geiserman* factors, for example.

20  We cited a Fifth Circuit case that dealt with an instance

21  where plaintiff or maybe it was a defendant failed to timely

22  submit an expert report.  Even if that is not the exact point

23  here, those factors are very relevant and instructive.

24        THE COURT:  Let me tell you this:  We wouldn't be

25  here if in fact y'all had followed the order or the

1    requirement of submitting a new scheduling order.  And that's

2    why -- if that hadn't been in there, if I hadn't required

3    another scheduling order -- y'all hadn't agreed to submit

4    another scheduling order, which was never submitted, then

5    this is what I presume -- and I'm going to talk to both sides

6    about this.

7         I presume that -- which is a very -- to assume

8    something, we all know what that means.  And I guess I

9    assumed that y'all were getting along, and, therefore, you

10   didn't need a scheduling order which is Utopia.  We have

11   enough people in here today to show that that just doesn't

12   happen.  And I know better than that, but when I'm handling

13   several hundred cases at a time, I'm presuming that the

14   lawyers are doing what they're supposed to do.  And if they

15   don't submit something, then they must be getting along to

16   the point that they're working and getting ready for trial.

17        The absence of that is that there is no scheduling

18   order.  But I'm going to address that with the other side.

19   Let me talk to them, too.

20        MS. CUNNINGHAM:  Okay.

21        THE COURT:  I understand your argument.  Thank you.

22        MS. CUNNINGHAM:  Thank you, Judge.

23        MR. LUNDY:  Good morning, Your Honor.  Matt Lundy

24   for the plaintiffs.

25        THE COURT:  Mr. Lundy, why didn't y'all submit

1  another scheduling order?

2        MR. LUNDY:  Well, I'll take some responsibility for

3  not forcing the issue, Your Honor.

4        THE COURT:  Both of you have to take the

5  responsibility.

6        MR. LUNDY:  I do.  But I think part of the problem

7  is this:  One, the Barrasso firm is now the fifth or sixth

8  firm involved in this case for CITGO, and they're facing --

9  CITGO is facing state court trials as well as this trial in

10 federal court.

11       You assumed correctly, Your Honor, prior to the

12 addition of the new firms that we were getting along fairly

13 nicely.

14       I need to correct a statement that was made that

15 January was the first time that Rosenfeld was affirmatively

16 mentioned.  That's incorrect.  Myself and Rudie Soileau sat

17 down with Marshall Simien and had a discussion about the

18 trial and who we would call, and we wanted to add Rosenfeld

19 and he wanted something, and so we agreed.  We had an

20 agreement that Rosenfeld would testify.  And our word is our

21 word still in Lake Charles.  Maybe when more firms get

22 involved we should put things in writing -- and I've learned

23 that lesson and I'll do that now.  But, you know, things over

24 there are still a gentleman's agreement is a gentleman's

25 agreement.

1          THE COURT:  Well, we're talking about a young lady.

2          MR. LUNDY:  Well, an attorney's word is an

3     attorney's word in Lake Charles and we still honor that over

4     there, Judge.

5          But they were facing -- CITGO was facing a

6     13-plaintiff trial in state court in the early part of this

7     year.  And I tried to get Mr. Simien to begin expert

8     discovery and do expert discovery at the end of last year.

9     He specifically told me we don't want to do anything until

10    April, until after our 13-plaintiff trial in state court.

11    And I said, well, we would like to go ahead and depose your

12    experts and Mr. Rouzan with the Barrasso firm said there's no

13    way we're going to let you depose our people before we depose

14    yours.

15         So we tried to move it along back then.  And we

16    were working in cooperation.  And apparently that has fallen

17    apart, and I guess we'll need some guidance from the Court

18    now.

19         THE COURT:  You did call and agree on a trial date.

20    Am I correct?

21         MR. LUNDY:  That's right.

22         THE COURT:  All right.  So at least we know y'all

23    have agreed on a trial date.  Did you put that in writing?  I

24    know you called at least.

25         MR. LUNDY:  I don't know if that was in writing or

1    not, Your Honor.  But we did agree on it and we called the

2    Court and a trial date has been set.

3              THE COURT:  All right.

4              MR. LUNDY:  And, you know, I think we can still

5    work in cooperation.  I have suggested to --

6              THE COURT:  Here's the question.

7              MR. LUNDY:  Yes, sir.

8              THE COURT:  Besides your expert, do you have any

9    medical that has been submitted?

10             MR. LUNDY:  No, Your Honor.  But this is what the

11   purpose of Rosenfeld is -- and they keep talking about

12   personal injury, and I think it's a red herring.

13             THE COURT:  So you're not asking for any personal

14   injury damages?

15             MR. LUNDY:  Other than the type of noxious odors

16   and things that would interfere with the use and enjoyment of

17   the property.  And we've pled loss of use and enjoyment of

18   the property.  We've pled --

19             THE COURT:  So you don't have any medical?  This

20   is --

21             MR. LUNDY:  No, Your Honor.  But he is going to

22   talk about what's in the slop oil; the characteristics of the

23   constituents, the persistency of the constituents, the

24   potential harmful effects that would cause someone to have

25   fear of using their property, of fishing off their pier now,

1    of letting their grand kids swim in the lake now, of enjoying

2    their property that they bought for the specific use of

3    enjoying the water.

4            And there has been testimony in these depositions

5    that, you know, people don't enjoy the property as they

6    intended when they purchased it and built their big homes or

7    big camps on the waterfront.

8            THE COURT:  Other than nausea and smell, what are

9    the other personal injury items we're talking about here?

10           MR. LUNDY:  I don't think in this first group,

11   Judge --

12           THE COURT:  I'm talking about this case.

13           MR. LUNDY:  The first five plaintiffs, I don't

14   think other than, you know, we've pled foul and noxious odors

15   and loss of enjoyment of use and recreation on their

16   properties, the loss of natural esthetic qualities, things

17   like that.  And we have to be able to put on evidence of

18   what's in the slop oil and what it can do and -- so that we

19   could prove these damages that we pled.

20           THE COURT:  You don't have an expert in that area?

21           MS. CUNNINGHAM:  Do we?

22           THE COURT:  Yes.

23           MS. CUNNINGHAM:  We do.  And they did as well.

24   That was the report that they disclosed in June of '08 which

25   is Randy Horsak.

1          THE COURT:  So you have two experts in the same

2     area?

3          MR. LUNDY:  Randy Horsak, Judge, was disclosed

4     earlier than that.  But -- in fact, most of our expert

5     reports were given to CITGO before suit was filed because

6     they've told us all along they wanted to settle the case.

7     But that's neither here nor there.

8          But Mr. Horsak sampled -- he pulled samples and he

9     was deposed yesterday about that.  He's not a toxicologist.

10    He's not going to talk --

11         THE COURT:  Wait a minute.  You're deposing people

12    now?  The scheduling order --

13         MR. LUNDY:  That's exactly right.

14         THE COURT:  -- since June of last year doesn't

15    allow that.

16         MR. LUNDY:  That's exactly right, Your Honor.  I

17    was going to bring that point up but I didn't --

18         THE COURT:  Do you need an expert to oppose his

19    expert?

20         MS. CUNNINGHAM:  Paul Rosenfeld?

21         THE COURT:  Yes.

22         MS. CUNNINGHAM:  Yes, sir, we do.

23         THE COURT:  Do you have one?

24         MS. CUNNINGHAM:  We have a couple in mind, sure.

25         THE COURT:  Have you used one in other cases?

1          MS. CUNNINGHAM:  We have, Judge.

2          THE COURT:  Okay.  Are you aware of the other

3    experts that they've used?

4          MR. LUNDY:  No, not specifically.  I'm sure they

5    called a toxicologist at trial in the state court case, but I

6    don't know any specifics.

7          THE COURT:  How much time do you need to get your

8    experts and get them a report?

9          MS. CUNNINGHAM:  Judge, as far as we're concerned,

10   we can maintain the trial date and we can get them up to

11   speed.  I guess the question is --

12         THE COURT:  The question I have is how soon can you

13   get that?

14         MS. CUNNINGHAM:  We can get them today.  We can

15   call them this afternoon and ask and make sure they have time

16   and they don't have scheduling conflicts.  But on that, I can

17   confirm to the Court probably tomorrow morning whether they

18   are onboard.

19         THE COURT:  I presume y'all don't want to lose your

20   trial date?

21         MR. LUNDY:  No, sir, Judge, we don't.

22         THE COURT:  Both sides.

23         MS. CUNNINGHAM:  No.

24         THE COURT:  All right.  Then this is what we do:

25   I'm going to allow -- I'm going to allow him to testify

1    because both sides are at fault here for not getting the

2    scheduling order.  I'm probably somewhat at fault for not

3    forcing the issue early on.  But, to be quite honest with

4    you, this thing kind of slipped through the cracks --

5    although I have enough paper there that it shouldn't have

6    slipped through the cracks, but it has.  I'm going to give

7    y'all -- today is Thursday -- until Monday to have an expert.

8    Okay?

9              MS. CUNNINGHAM:  (Nods head.)

10             THE COURT:  If that becomes a problem, let me know

11   because I may bump the case.  I have a lot of other cases set

12   behind it.

13             Can your expert be up to speed on this issue and

14   have a report and have him deposed by mid-May?

15             MS. CUNNINGHAM:  I think that's doable, Judge.

16             What we would anticipate, looking at Rosenfeld's

17   report, he provided an air model and then talks about, as far

18   as I can tell, toxicological effects of exposure to different

19   chemicals.  Again, they say it's not a PI case necessarily,

20   but what we would --

21             THE COURT:  Well, it is limited.  It is limited at

22   this point.

23             MR. LUNDY:  It is, Judge.  And the thing about

24   Rosenfeld is that he has been hired in state court cases by

25   other plaintiffs' attorneys and he's prepared a number of

1    reports that sort of encompass everything from air modeling

2    to maybe groundwater to whatever, but things that don't

3    necessarily apply here.  But, you know, part of his report is

4    the subset of the big picture which we would use, and that's

5    talking about what's slop oil, the persistency, the potential

6    effects of it.  But we don't have an air modeling case, and

7    some of their concerns are really not warranted.

8             MS. CUNNINGHAM:  I guess, Judge, that makes it

9    really difficult for us to identify an expert simply from the

10   report --

11            THE COURT:  You have his report?

12            MS. CUNNINGHAM:  We do.

13            THE COURT:  He is going to be bound by his report.

14            MS. CUNNINGHAM:  Okay.  Assuming that's the case,

15   then --

16            THE COURT:  You don't have to assume that.  That is

17   the case.

18            MS. CUNNINGHAM:  Okay.

19            THE COURT:  He is bound by his report.

20            MS. CUNNINGHAM:  Okay.  So we would anticipate two

21   experts, a modeler as well as someone to discuss the

22   toxicological effects of the exposure -- or just what's in

23   the slop oil and giving their slop oil studies, you know, to

24   counter what Dr. Rosenfeld is saying.

25            THE COURT:  Okay.  You can have both those by

1     Monday?

2          MS. CUNNINGHAM:  Yes, sir.

3          THE COURT:  And you can take them -- you can have a

4     report and take the deposition by mid-May?

5          MS. CUNNINGHAM:  Yes, Judge.

6          THE COURT:  We're not going to have an air modeling

7     case, Judge.  They don't need to go hire an air modeler.

8          THE COURT:  Okay.

9          MR. LUNDY:  I'm giving them my word we're not going

10     to have an air modeler.

11          THE COURT:  Well, you've also put it on the record.

12          MR. LUNDY:  Yes, sir, I have.

13          THE COURT:  Okay.  So now you're down to one.

14          MS. CUNNINGHAM:  We're down to one at this point.

15          THE COURT:  So we'll have an expert by Monday.

16          MS. CUNNINGHAM:  Okay.

17          THE COURT:  And we'll take the deposition by

18     May 15th.  I don't know what day of the week that is,

19     May 15th.  And his report has to be turned over to opposing

20     counsel.

21          Have y'all taken Rosenfeld's deposition?

22          MR. LUNDY:  Well, they asked me for dates a week

23     ago.

24          THE COURT:  The answer is no?

25          MR. LUNDY:  No.  I gave them to them, but they

1   haven't responded.

2           THE COURT:  I have a lots of people out there.  I'm

3   asking questions.

4           MR. LUNDY:  No, Judge, they have not.

5           THE COURT:  Okay.  But they have a report?

6           MR. LUNDY:  They have a report and they have

7   deposition dates.  They just haven't responded to them.

8           THE COURT:  All right.  Y'all have a deposition

9   date scheduled for him now?

10          MR. LUNDY:  I gave them dates but they have not

11  respond.

12          THE COURT:  Okay.

13          Are those dates satisfactory?

14          MS. CUNNINGHAM:  I don't know the dates off the top

15  of my head, Judge.  I apologize for that.

16          Judge, could I just ask for a little latitude?

17  Since we're extracting the air modeling part of it, I would

18  like the opportunity to sit down and figure out what's what

19  at this point, and then identify an expert, you know, Monday.

20  But if we need -- if we feel like we need two, would the

21  Court permit us two experts at that point just given what's

22  kind of left in the report?  I'm just not sure how it's going

23  to look --

24          THE COURT:  Experts are like noses, everybody has a

25  right to them.  If he has an expert in one field, you have a

1    right to one expert in the same field.  You don't have a

2    right to two experts in the same field.  If his -- if his

3    expert is testifying to air modeling, then you find someone

4    who can testify to both.  That couldn't be that hard to do.

5    If his guy does it, your guy ought to be able to do it.  Just

6    give them -- I'm not going to say that.

7           They can do it.  Okay?  Just -- so if he has two,

8    you have a right to two.  If he has one, you have a right to

9    one.  And we'll try to keep this trial date.

10          MR. LUNDY:  One of the things I had suggested to

11   defense counsel, and I haven't heard back from them, is

12   that --

13          THE COURT:  That's because y'all are not talking.

14          MR. LUNDY:  I know.  Now we're not.  We were doing

15   fine.

16          THE COURT:  I'm going to put y'all in a room and

17   make y'all talk.

18          MR. LUNDY:  -- was a cut-off date to list our will

19   call witnesses and review exhibits and --

20          THE COURT:  That's why we have a scheduling order

21   that none of y'all did.

22          MR. LUNDY:  I understand.

23          THE COURT:  All right.  Let me tell you what we're

24   going to do.  We're going to pass y'all right now and y'all

25   are going to go in that conference room, and you're going to

1    work out a scheduling order.  Then you're going to come back

2    in here and tell me what the scheduling order is, and see if

3    I can live with it.

4          I'm not going to have *Daubert* hearings the day

5    before the trial.  Okay?  I'm not going to do it because -- I

6    anticipate y'all will be filing some *Daubert* motions.

7    Hopefully you won't, but if you do, we'll take a look at it.

8          But y'all go in and work out -- do you need a copy

9    of a scheduling order?

10          MR. LUNDY:  No, sir.  I brought it, Your Honor.

11          THE COURT:  Okay.

12          MR. LUNDY:  You had asked us to bring our yearly

13   calendars.

14          THE COURT:  That's because I was thinking about

15   bumping this case.

16          MR. LUNDY:  I don't know if -- you had severed all

17   the other cases.  I didn't know if you wanted to start

18   setting those.

19          THE COURT:  Well, these are the five -- are these

20   the --

21          MR. LUNDY:  Bellwethers.

22          THE COURT:  Bellwethers.  I want to keep that.

23   Judge Hill and I had spoken about that.  If this case is

24   going to be resolved, we have to go through the bellwethers

25   so we're not going to do that right now.

1          We may need your calendars to schedule -- do you

2    have five more?  Have you gotten to that point where you can

3    pick out the others?

4          MR. LUNDY:  Well, we are, Judge, but it was

5    difficult for us to agree upon these five.

6          THE COURT:  Well, that's because you want the best

7    five you got and they want the worst five you got.

8          MR. LUNDY:  We agreed on four, and we couldn't

9    agree on the fifth one.

10          MS. CUNNINGHAM:  I'm not sure we talked about it.

11          MR. LUNDY:  But we can talk about that, too.

12          THE COURT:  Okay.  Y'all go see if you can get me a

13    scheduling order.  Then we'll bring you back in.  You can go

14    right through that door and right in the door across the

15    hall.  And they have two bathrooms and Cokes.  You can even

16    make your own coffee depending on how long you are going to

17    be there.

18          MR. LUNDY:  Thank you, Judge.

19          MS. CUNNINGHAM:  Thanks, Judge.

20          THE COURT:  Wait a minute.  The date of the trial

21    is set for June 8th?

22          MR. LUNDY:  Yes, sir.

23          THE COURT:  June 8th I'm going to be in Florida, I

24    think, at the Bar conference.  Y'all mailed a letter in

25    saying that y'all agreed to June 8th without checking on my

```
 1    calendar to see if that date was available for me, and it is

 2    not because I'll be at the Bar Association convention the

 3    10th, 11th, and 12th or something like that.  So that date is

 4    not a good date.

 5              MR. LUNDY:  Okay.

 6              THE COURT:  Because I don't want to bump this

 7    thing, I can do it June 22nd which is only two weeks away

 8    which also gives you a little time to work on things without

 9    giving you serious problems.

10              That date is good for me.  It's an office week for

11    me, and I'll take it up and try it on the 22nd.

12              MS. CUNNINGHAM:  That's good for the defendant.

13              THE COURT:  Is that good for you?

14              MR. LUNDY:  That's fine, Judge.

15              THE COURT:  Is that a good date?

16              MR. LUNDY:  Yes, sir, Your Honor.

17              THE COURT:  Okay.  We're going to go with

18    June 22nd.  I'm not going to do a pretrial unless you need

19    it, and put that in your scheduling order as you go in and

20    discuss that.

21              MR. LUNDY:  Okay.  Thank you, Judge.

22              THE COURT:  Thank you.

23                        (A recess was taken.)

24                       AFTER THE RECESS

25              THE COURT:  Have y'all worked out in the *Ackel*
```

1    case?

2            MR. LUNDY:  Yes, Your Honor.

3            THE COURT:  Do you want to put something on the

4    record?  Do you have a scheduling order, guys and gal?

5            Let's put it on the record.

6            MS. CUNNINGHAM:  Okay.  Judge, we are going to have

7    the expert -- Monday we're going to advise the parties of our

8    expert.

9            THE COURT:  Okay.

10           MS. CUNNINGHAM:  I understand from Mr. Lundy by

11   tomorrow he is going to provide us Rosenfeld's report and

12   scratch all the portions that he's not going to testify to so

13   we can find an appropriate expert for Monday.

14           THE COURT:  Fair enough.

15           MS. CUNNINGHAM:  May 15th is going to be the last

16   day on which our expert, the one that we're identifying

17   Monday, can be deposed.

18           THE COURT:  All right.

19           MS. CUNNINGHAM:  And we've agreed that seven days

20   before that expert's deposition we'll provide a report.

21           THE COURT:  Very good.

22           MS. CUNNINGHAM:  So that's -- even if we, say,

23   depose her on the 13th it will be seven days before the 13th.

24           THE COURT:  Okay.  So don't set it on the 1st of

25   May.  Don't try to set it on the 1st of May.  Give them some

1    latitude there.

2          MS. CUNNINGHAM:  May 22nd we have several

3    deadlines.  Will call witness list.

4          THE COURT:  And will call means will call, not may

5    call.  There is no such thing as a may call.  If you list

6    someone as a will call witness, that person will be -- even

7    if you decide a couple days before not to call them, you

8    can't release that person until the other side agrees because

9    they may want to call them.  Okay?

10         MR. LUNDY:  Yes, Your Honor.

11         THE COURT:  Fair enough?

12         MS. CUNNINGHAM:  Yes.

13         MR. LUNDY:  Fair enough.

14         MS. CUNNINGHAM:  And then also on the 22nd we have

15   the expert discovery deadline, the cut-off expert discovery.

16         THE COURT:  Okay.  What date is that?

17         MR. LUNDY:  May 22nd.

18         MS. CUNNINGHAM:  May 22nd.

19         THE COURT:  Okay.

20         MS. CUNNINGHAM:  And the following Friday we have

21   several deadlines.  One is the *Daubert* motions.

22         THE COURT:  Okay.

23         MS. CUNNINGHAM:  Two is the exhibit list and

24   exchange of exhibits.  And three is all discovery cut-off on

25   that date.

1          MR. LUNDY:  Right.

2          THE COURT:  All right.  That's the filing of the

3    *Daubert* motions?

4          MS. CUNNINGHAM:  Friday, June 5th is all three of

5    those.

6          THE COURT:  Okay.

7          MS. CUNNINGHAM:  And then the following week, which

8    is June 12th, we have motions in limine.

9          And then June 15th we have the delivery of CD Rom

10   exhibits and realtime glossaries for you guys.

11         And we decided if we need a pretrial -- the

12   standard order I'm looking at does contain some additional

13   matters that we probably should hammer out, but I think the

14   Court probably has a preference on those.  For example, jury

15   instructions and interrogatories.

16         THE COURT:  Jury instructions have to be joint jury

17   instructions.

18         MS. CUNNINGHAM:  Okay.

19         THE COURT:  I don't want more than two per side

20   that you object to.

21         MS. CUNNINGHAM:  Okay.

22         THE COURT:  Which means you are going to have to

23   cooperate with one another.  If there is more than two per

24   side, then I may sanction somebody.

25         MR. LUNDY:  Okay.

1          THE COURT:  So y'all are going to have to work

2     together on that.

3          And we are set for trial on the 22nd --

4          MS. CUNNINGHAM:  Yes, Judge.

5          THE COURT:  -- so I want the jury instructions by

6     the 15th.

7          MS. CUNNINGHAM:  Judge, would that follow suit for

8     the voir dire questions?

9          THE COURT:  You can provide them, too.  I allow

10    voir dire in civil and criminal cases.  I don't allow a lot

11    of it, but I ask a lot of questions going back to my state

12    court days because I think y'all need to know who the people

13    are.

14         MR. LUNDY:  Judge, do you want some voir dire

15    questions or can you --

16         THE COURT:  Yeah, you can send some.  I'm going to

17    give y'all only about 15 minutes per side on voir dire.

18         MR. LUNDY:  But do we have to have the Court

19    pre-approve those questions?

20         THE COURT:  No, you don't have to.  But you can't

21    take more than about 15 minutes.

22         MR. LUNDY:  So then we don't need to provide the

23    Court with any voir dire?

24         THE COURT:  No.  We'll find out who they are, do

25    they have any relationship with the company, any relationship

```
 1   with any of y'all.
 2            This is a Lake Charles case?
 3            MR. LUNDY:  Yes, sir.
 4            MS. CUNNINGHAM:  Yes, sir.
 5            THE COURT:  Y'all want to try this in Lake Charles?
 6            MR. LUNDY:  Would you be amenable to doing that,
 7   Your Honor?
 8            THE COURT:  Yes.
 9            MR. LUNDY:  Yeah, I think we would.
10            MS. CUNNINGHAM:  We would like Lafayette because we
11   are closer.
12            THE COURT:  But it's a Lake Charles case.
13            MS. CUNNINGHAM:  It is a Lake Charles case, Judge.
14            THE COURT:  And I'm going to try to do more and
15   more of that in Lake Charles if we -- because it's a
16   Lake Charles case.
17            So we'll try it in Lake Charles.
18            MR. LUNDY:  Thank you, Your Honor.
19            THE COURT:  That's assuming I can get a courtroom
20   over there.  If Judge Minaldi -- and I think there will be
21   one over there.
22            MR. LUNDY:  Good chance.
23            THE COURT:  I don't -- the other courtroom I don't
24   think is equipped with all the electronic stuff that we
25   have so if you have -- I'll see.  I'll talk to Judge Minaldi.
```

1    I think we do have portable stuff that we can use.  We can

2    use the portable stuff and bring it in -- portable equipment

3    I should call it.  I shouldn't call it portable stuff.

4           What else?

5           MR. LUNDY:  I think those are all the deadlines,

6    Your Honor.

7           THE COURT:  All right.

8           MR. LUNDY:  Does the Court --

9           THE COURT:  Jury verdict form.  Y'all submit a

10    joint jury verdict form.

11           MR. LUNDY:  Do you want that before the trial --

12           THE COURT:  Yeah.

13           MR. LUNDY:  -- or during the trial?

14           THE COURT:  Probably -- probably before the trial,

15    but like just -- you can bring it the day of trial.

16           How long is the trial going to last?

17           MR. LUNDY:  I don't think it's going to take very

18    long.

19           THE COURT:  What does that mean?  I've heard that

20    before.

21           MR. LUNDY:  It shouldn't take more than a week,

22    Judge, and probably less than that.

23           THE COURT:  It won't take a week.

24           MR. LUNDY:  I wouldn't think it would.

25           THE COURT:  I'm not going to be there a week.

1          And let me tell you what I do:  We're going to pick

2      the jury.  We're going to start opening statements and we're

3      going to put the first witness on by 1:30.

4          We're going to work the first day until 5:00.  The

5      next day we're going to start at 9:00 in the morning and we

6      may stay until 6:00 or 7:00 if we have to so we can complete

7      the trial in at least a week or less than a week.  If we have

8      to go later than that, then we will go later than that.

9          I will expect when the plaintiff has their -- is

10     putting on their case in chief, they have their witnesses

11     ready, willing, and able to take the stand one after another

12     even if we put that person on at 7:00 at night.

13         And the same goes for the defense, have your

14     witnesses ready to be put on the stand.

15         And if you're calling some of their people in your

16     case in chief, you need to let them know in advance who you

17     need and when you need them.

18         MR. LUNDY:  We don't need to subpoena them, then?

19     They just need to have them available?

20         THE COURT:  Not if they work for the company.

21         Would you provide them without being subpoenaed if

22     they work for the defense.

23         MS. CUNNINGHAM:  Yes.  Everybody is in

24     Lake Charles.

25         THE COURT:  Well, that's good.  That's why we'll be

1    there.

2              Off the record, Mary.

3                        (Discussion off the record.)

4              THE COURT:  After we release the jury, we'll take

5    up any of the motions at the end of the day that we need to

6    take up.

7              If there are *Daubert* motions, we'll probably take

8    those up during the noon hour on Monday after we pick the

9    jury.  So be -- tie it on, because we're going to work to get

10   it done within that week.  Okay?

11             MR. LUNDY:  All right.

12             Again, I apologize, Your Honor.  I probably should

13   have forced this issue long before now.

14             THE COURT:  Listen, man, it ain't the first and it

15   won't be the last.

16             MR. LUNDY:  I know it won't be, Judge.

17             THE COURT:  Thank you very much.  Thank you for

18   working it out.  I appreciate it.  Let me know if you settle

19   before then.

20             MR. LUNDY:  Yes, sir.

21                        (Proceedings adjourned.)

22

23

24

25

```
1                    UNITED STATES DISTRICT COURT.

2                    WESTERN DISTRICT OF LOUISIANA

3                      LAKE CHARLES DIVISION

4

5      ALEXANDER LEO ACKEL, JR.          *
                                         * DOCKET NUMBER
6      VS                                * 07-1052
                                         *
7      CITGO PETROLEUM CORPORATION       *
       *********************************************************

8                      CERTIFICATE OF REPORTER

9

10         I, Mary V. Thompson, Official Court Reporter for the

11     United States District Court, Western District of Louisiana,

12     do hereby certify that the foregoing 29 pages are a true and

13     accurate transcript of the proceedings had in this matter, as

14     hereabove set forth, and that I have no interest of any

15     nature whatsoever regarding the ultimate disposition of this

16     litigation.

17         I further certify that the transcript fees and format

18     comply with those prescribed by the Court and the Judicial

19     Conference of the United States.

20

21                              _____
22                              MARY V. THOMPSON, RMR, FCRR
                                Official Court Reporter
23

24

25
```